UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CHRISTOPHER M. MURPHY and BAR-
BARA M. CAMILLI,

Plaintiffs

vs.

COUNTY OF CHEMUNG; CITY OF EL-
MIRA; BRYAN MAGGS; MATTHEW
BUZZETTI; JOSEPH MARTINO and
JOHN DOES Numbers One through
Five,

Defendants
-------------------------------------------------------x

**COMPLAINT**

Case No.

18 CV 6628 MAT

Plaintiff, Christopher M. Murphy, complaining of the Defendants above-named, as and for his Complaint, respectfully alleges and shows to this Court as follows:

## JURISDICTION & VENUE

(1) This action arises under the Constitution of the United States and, more particularly, the Fourth, Eighth, Ninth and Fourteenth Amendments thereto (U.S.Const., Amends. IV, VIII, IX and XIV § 1), as well as federal statutory law and, more particularly the Civil Rights Act, Title 42 of United States Code (42 U.S.C. § 1983).

(2) Based upon the foregoing, this Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1343(a)(1), 1343(a)(3) and 1343(a)(4).

(3) Venue in the Western District of New York is proper and appropriate under

Page 1

28 U.S.C. § 1408(1) and 28 U.S.C. § 1391(b).

## THE PARTIES

(4) At all times hereinafter mentioned, Plaintiff Christopher M. Murphy ("I,"
"me") was a resident of the City of Elmira, County of Chemung and State of New York.
Since October of 2015, Plaintiff Christopher Murphy has resided in the Village of Bath,
County of Steuben.

(5) At all times hereinafter mentioned, Plaintiff Barbara Camilli was a resident
of the City of Elmira, County of Chemung, and State of New York.   Since October of
2015, Plaintiff Barbara Camilli has resided in the Village of Bath, County of Steuben.

(5)  The Defendant County of Chemung ("the County") is a municipal corpora-
tion and political subdivision of the State of New York established, organized and exist-
ing under the laws of the State of New York.

(6) The Defendant City of Elmira ("the City") is a municipal corporation and
political subdivision of the State of New York, duly established, organized and exist-
ing under the laws of the State of New York and situated within the County of Chemung.

(7)  Upon information and belief, at all times hereinafter mentioned, Defen-
dant Bryan Maggs was the Chemung County Attorney, employed by and acting on be-
half of the aforementioned Defendant County.

(8) Upon information and belief, at all times hereinafter mentioned, the Defen-
dant Matthew Buzzetti was the Assistant City Attorney/Assistant Corporation Counsel

for the Defendant City and was employed by and acted on behalf of the Defendant City.

(9) Upon information and belief, at all times hereinafter mentioned, the Defendant Joseph Martino was, and he now is, employed as Elmira City Fire Marshal.

(10) Upon information and belief, at all times hereinafter mentioned, the Defendants John Doe Number One through John Doe Number Five were, and they now are, employed as police officers by and for the Defendant City of Elmira, whose names and identities are not presently known to Plaintiff, but whom I believe will almost certainly be liable to Plaintiffs in connection with their actions as hereinafter complained of and described; notice is thus hereby given as to the likelihood of joining some or all of the individuals named now only as John Does in the future; as soon as Plaintiffs are able to ascertain the actual names and identities of these Elmira Police officers, they will be joined as additional Defendants by name, in an Amended Complaint; if necessary, permission to file such Amended Complaint will be respectfully requested of the Court by motion on notice.

## **THE FACTS**

(11) On or about August 12, 2015, then-Acting Elmira City Judge Scott Miller dismissed, outright and unconditionally, a dozen or so misdemeanor criminal charges that had been filed against me by then-Elmira City Assistant Attorney/Assistant Elmira City Corporation Counsel, Ottavio Campanella, and Defendant Elmira City Fire Marshal Joseph Martino on or about March 16, 2012.

(12) All of said misdemeanor criminal charges filed against me by the aforementioned Defendant Martino and then-Assistant City Attorney Otto Campanella had been filed  under the statutory authority of Executive Law Section 382(2) based upon alleged residential code violations claimed to exist inside my Elmira home.

(13) All of the evidence relied upon by the City of Elmira, its officials and its officers had been obtained in the course of the search of my home undertaken by Elmira City Police SWAT team officers on January 20, 2012.   This search was purportedly authorized by and under a search warrant signed by then-Elmira City Judge Thomas Ramich on January 12, 2012.

(14) Prior to the  formal unconditional dismissal of all pending misdemeanor criminal charges filed against me by the City actors, then-Acting City Judge Miller had signed and issued an order, suppressing and excluding any and all evidence obtained by the City actors in connection with their search of my home on January 20, 2012.    The suppression order was signed by Judge Miller on August 10, 2015.

(15) As a matter of law, the net practical effect of the suppression order signed by Judge Miller on August 10, 2015 was to render any and all evidence obtained by the City of Elmira and City actors in connection with their search of my home on January 20, 2012 wholly unavailable on or for any future criminal, civil or administrative actions or proceedings or any other possible uses or applications.

(16) Nonetheless, soon after all of the original criminal charges that the Defendants filed against me back in 2012 were unconditionally dismissed, the Defen-

dants filed some new charges - this time not only against me, but also against the other Plaintiff in this action, Barbara Camilli, who has been my girlfriend for many years.      This second round of criminal charges were brought pursuant to the same statutory provision as the criminal charges that had been so recently dismissed by Judge Miller[1] - namely, Executive Law § 382(2).

(17)   Upon information and belief, these misdemeanor criminal charges were instigated and filed at the personal  and active direction of Defendants Buzzetti and Martino, in their respective official capacities as Elmira City Assistant Attorney and Elmira City Fire Marshal respectively.

(18)   Upon information and belief,   the accusatory instrument and misdemeanor complaint, filed in Elmira City Court to formally commence the criminal prosecution against Barbara and me was signed, executed and sworn to by Defendant Martino, acting at the personal instance, behest or direction of Defendant Buzzetti.

(19)   Upon information and belief, upon the formal filing of these misdemeanor criminal charges, Defendant Buzzetti, from that time and at all times thereafter, personally, actively and directly conducted, pursued and prosecuted the case, assisted and supported throughout by and with Defendant Martino personally and actively.

(20) Based on these charges, Barbara and I were both subjected to full custodial arrest - being clapped in handcuffs and transported in custody to the Elmira Police sta-

_____

[1] Judge Scott Miller, by the way, is the City Judge of Ithaca.   He was assigned to preside over my case by Hon. Robert Mulvey, Justice of the Supreme Court, Administrative Judge for the Sixth Judicial District.      .

tion, but released without bail on our own recognizance.

(21)  Judge Miller unconditionally dismissed all of these new charges as well. I do not have the dates on which these charges were filed or dismissed before me at this time.   Nonetheless, upon information and belief, the charges were filed after September 2, 2015.   They were unquestionably dismissed some time after that date.

(22)  Not to be discouraged, the Defendants decided to file more charges, but this time under a different statute - namely, Penal Law § 140.05.    The theory this time was trespass - and these were quasi-criminal, rather than criminal, charges.

(23) Upon information and belief, these trespass charges were instigated, filed and initiated by Defendant Martino,  presumably at the personal behest or direction of Defendant Buzzetti,

(24) Upon information and belief, Defendant Buzzetti personally, actively and directly pursued and prosecuted the case against Barbara and me from start to finish - acting jointly and in concert with Defendant Martino, who actively supported, assisted, collaborated, advised and otherwise actively participated on a continuing basis over the entire pendency of the proceedings.

(25)  I do not have the specific date on which these charges were filed at this time, but I know that they were filed after September 2, 2015.

(26)  Judge Miller dismissed all of these charges unconditionally as  well - this time with prejudice, as announced from the Bench - well after September 2, 2015.

(27) In the early morning hours of September 2, 2015, a bunch of Elmira Police

officers descended on my home out of the clear blue - with no prior notice or warning at at all.   They just showed up and started busting down the (new) front door of our house - without ever knocking or verbally announcing their presence or purpose beforehand, as required under Criminal Procedure Law § 690.   Upon busting the door down, they immediately entered our house and proceeded directly to the first-floor bedroom that Barbara and I share.

(28)   The police were yelling at us, shouting all sorts of orders and commands - and immediately started pushing us toward the front door very quickly and impatiently.

(29) As soon as we were outside, we were both immediately handcuffed behind our backs - and searched.  I asked these officers what lawful authority they had for doing any of this.   I also asked if they had any kind of warrant.   One of the officers informed us that they were acting at the direction of Chemung County - which owned the property.      I was then handed the paper of which I hereto annex a copy as Exhibit A.

(30)   One of the cuffs was way too tight and was really hurting my wrist - in a way that went well beyond discomfort.        I asked one of the cops as politely as I could to please loosen that one cuff because it was really hurting me.    This guy blew me off completely - with the assurance that he would look into the matter once we got to the station.    He never loosened the cuff and I was hurting the whole time we were at the Elmira Police station.   I stopped asking when it was clear that nothing would be done.   Nonetheless, from that day to this, I did not forget this small slice of the reality

we dealt with that day.

(31) Barbara and I were held in custody and in handcuffs for probably an hour and half - most of which time we were just left handcuffed and alone in adjoining little rooms.   After being handed appearance tickets charging us with trespass, we were released without bail.     The trespass charges were later all unconditionally dismissed by Judge Miller.

(32)   Owing to the rush in which the officers had pushed us out of our home, I was barefoot when I was released from custody.       Barbara walked over to nearby Samaritan Center (a local charity) and was able to get me a pair of shoes.

(33)   We then walked home - only to find City actors all over the place.  Police, fire, code, maintenance.   Defendant Fire Marshal Joseph Martino was busy with a couple of City maintenance guys - completely boarding up every door and window in our house with large sheets of particle board.

(34)   Our most immediate concern was our four cats - all of whom were in the house when we were forcibly ejected.     This being the case, there was every reason to suppose that all of them were still locked up inside.       These guys were boarding up completely every door and every window in the house.   We were more or less begging them to just let us go in and rescue our cats before they went much further.   One of the police officers stepped forward to inform us that we would not be allowed to do this.  He went on to tell us that Animal Control would deal with "any pets" on the premises.     I asked him how Animal Control would be able to do this if all of the doors and windows

of the house were completely boarded up and sealed off.   "That is not my problem," he let me know.

(35) Everyone of these guys on the scene seemed to go out of his way to be nasty, mean and with no patience whatsoever with us - and, once again, this was so persistent, overstated and overly-dramatic that it is difficult to chalk up to mere co-incidence or random happenstance.   This is especially true when one takes into account the unmistakable fact that it happened every time there were any dealings or encounters with Elmira police officers in connection with this case.

(36) It is, I think, important to bear in mind in this regard that the worst thing we might have been guilty of was of being something akin to a holdover tenant.   In-asmuch as we had never been given notice by the County as to its assertion of owner-ship of our home and never been asked or told to vacate the premises, we could not be regarded as trespassers, either under the Penal Law or civilly.   Nonetheless, as will be later explained, we were not holdovers.    Indeed, we had every right to be and remain our home - and no government entity, official or officer had any authority or right to do anything whatsoever that might disturb or interfere in any way with our possession and enjoyment of our own home and property.

(37)  More than one of the police officers went out of the way to make it crystal clear to Barbara and me that, if we made any attempt to reenter the premi-ses or to get back into the house - or even set foot on any part of the yard or exter-ior of the property, we would be immediately arrested and transported to the Che-

mung County Jail.

(38) Upon information and belief, this threat of arrest and criminal prosecu-

tion, although not given personally or directly by any of the Defendants themselves,

was issued and given at the express personal behest and direction of Defendants Maggs,

Buzzetti and Martino, who, as aforesaid, upon information and belief, acted jointly and

in concert on a continuing basis over the entire period covered by this case.

(39) On at least two occasions, Barbara and I personally saw Defendant Mar-

tino driving on public roads immediately in front of (Linden Place) and immediately

behind (Benton Place) in an unmarked white City of Elmira vehicle. On one of those

occasions, I personally confronted Defendant Martino - while he was driving slowly

on Benton Place - and asked him why he had been  driving around our home. As I re-

call, he answered that he was doing this just to "keep and eye on things."

(40) In any event, on that morning of September 2, 2015,  it became clear to Bar-

bara and me that we would never get anywhere with these people, so we decided to walk

over to Wegman's - which was near our home.    We sat on a bench outside the store for

hours - until well after it got dark out.

(41)  Barbara owns a Chevy Lumina - that was parked in our backyard drive-

way.    The car had problems that prevented us from driving at that moment in time,

but it was validly and currently insured and registered. Both the front and rear license

plates were clearly displayed.

(42)  We decided that the best thing for us to do under the circumstances was

to spend the night in her car - with the seats arranged right, we should be able to get some sleep.     As we were preparing the car for this purpose, two Elmira Police cars showed up.     The officers said that they were giving us sixty (60) seconds to remove ourselves from the County's property - and if we did not do so, we would both be arrested and transported to the Chemung County Jail.     We got off the property and onto Benton Place, which runs behind our property, with time to spare.

(43) Barbara and I had nothing but the clothes on our backs, so this was a bad situation for us all around.     We finally decided to spend the night at nearby Brick Pond - which was surrounded by a lot of high weeds and bushes that we felt we could make use of in the hope of concealing our presence there from the police, who seemed to be patrolling adjacent Sullivan Street as if there were on the lookout for suspects or fugitives.   In other words, us - or so we were convinced.

(44)   So, we spent the night - or what was left of it - huddled in the bushes and weeds around Brick Pond, essentially just hiding out and passing time, and trying to get at least some sleep.  We were never able to get any real sleep - either of us.

(45)   The first thing that we did when the new day broke was to start going to see and speak to people who we felt might help us rescue our beloved cats.   We needed someone who would somehow make it possible for us to get back inside our house to accomplish this.

(46) Barbara and I had decided, at the start, that, if we could find anyone who

would let us or help us rescue our cats that day, we would just go over to our house -

and take to particle board sheet off the back door and go in ourselves and rescue the

cats and thereupon get them somewhere safe and beyond the reach of anyone who

might want or intend to take them away.     Sweat the consequences later on.

(47)   Nonetheless, as fate would have it, we finally found someone who want-

ed to help - and it was some sergeant or supervisor at the police department.     He ar-

ranged for some City guy to go over to our house and removed the board blocking off

the back door long enough for me to get inside and grab our cats, all of whom were con-

veniently huddled together in the middle of our bed and their collars and some leashes

and we were able to make a clean getaway with our cats in hand (or arms).

(48)   We wound up having to spend yet another night outdoors - once again

at Brick Pond - this time with four hungry and uncooperative cats in tow.     They did

not get the memo about hiding from police and cooling it.

(49) The next day, I decided to go see Elmira Police Captain (now Elmira

Police Chief) Joe Kane, who I like and get along with rather well, in the hope of

coming up with some ticket out of the wilderness of Brick Pond and stuff to eat

for us and our cats.   Before I said a thing, Captain Kane told me that District At-

torney Weeden Wetmore wanted me to call him.     The three of us then met out-

side the District Attorney's Office.

(50) I have long enjoyed a good and amicable relationship with Weeden

Wetmore.     Not suprisingly - to me anyway - Weeden intervened on our behalf

with the Defendants - and arranged for Barbara and I to get inside the house for a half hour to grab things that we needed immediately.        Make no mistake about one thing.    If Weeden had not kindly interceded on our behalf with the Defendants - and if he did not have superior clout and power than them - we would never have been allowed to get back inside our home        According to the official state-. ment of the Defendants, there was no reason for us to get back inside the house, inasmuch as the County of Chemung owned not on the real property, but any personal property or contents of the house at the time of our departure from the premises.

(51) In any event, we were able to get back inside our house - albeit only for a brief period of time.    Unfortunately, the Defendants had directed NYSEG to cut off the power and electricity, so we had no lights.    Moreover, every door and window was completely boarded up and covered up, so no daylight at all could get in to relieve any of the total darkness inside the house.    As fate would have it, Captain Kane did not have a flashlight in the undercover police car in which he had driven Barbara and me over to our house to grab stuff.

(52)  Having to operate in total darkness made it impossible to grab any more than a very few things we needed.  In fact, none of the stuff that we *really* needed - except the one thing we needed most, money.        I was able to get my hands on the cash that I had hidden in a book on a bookshelf in our bedroom.

(53)  In short order, we were in a taxi on our way to Motel 6 - which allows guests to bring their pets.    We got a room and wound up staying in it for

a month.

(54)   The very next day after our first night at Motel 6, I went to the Che-
mung County Clerk's Office - in the hopes of finding out what the deal was with
regard to this business talked about in Exhibit A.

(55) The full account and complete story that lies behind the skeletal facts
provided in Exhibit A is long, involved and involves a number of state law issues,
and it is well beyond the scope of this pleading.  Nonetheless, for present purposes,
I think that the nutshell version will be adequate and sufficient.

(56) Look at Exhibit A.   It clearly shows that the County of Chemung is
holding itself out as the owner of this property.       So too, the fact of County ow-
nership, without more, furnishes the lawful authority for the government actors to
take all of the actions complained of here.  In other words,  the actions taken by
them on and after September 2, 2015.

(57) This is, of course, a bunch of nonsense, for reasons too plentiful  to count.
Moreover, Defendants Maggs and Buzzetti are both attorneys, so they almost certainly
knew this, but apparently did not care.    Upon information and belief, the raison d'etre
of their personal agenda and the one thing they sought to accomplish from the very start
was the major hurt put on me by the governmental actions purported all authorized by the
County's claim of title.

(58) Assuming arguendo that the County did, in fact, somehow acquire good
and lawful title to my property, but elected to do things in the lawful and proper man-

ner to secure exclusive possession of the property and evict any individuals on the premises, the County would have gone back to court - presumably with a summary proceeding under Article 7 of the Real Property Actions and Proceedings Law.   Such a proceeding would, of course, require written notice to me and provide me with the opportunity to challenge the County's action.

(58) The problem with the "lawful" or "legal" way of doing things - for the Defendants - is that the whole point and purpose of their personal agenda was solely to visit upon me all of the horrendous, catastrophic upheavals and consequences that I suffered as the direct result of the government actions on and after September 2, 2015.   This parade of horribles that was the Defendants' sole purpose and plan from the start was only possible if the Defendants did *not* do things the "legal" way, but rather did them just the way that they *did*, in fact, do them.   It would be impossible for them to accomplish the only thing that they ever wanted to accomplish here - namely, catastrophic upheaval, nightmare ordeal, the weeping and gnashing of teeth and the like - unless they were happy to break the law and violate federal constitutional rights and protections resorting to actions that were outrageous and jaw-dropping. But that is exactly what they decided to do - and it succeeded brilliantly.   They set out to put a world-class hurt on me, to do it in notorious style and in a very public way. At the end of the day, they did just that.

(59) In any event, it is respectfully submitted that none of this with these two Defendants was ever even remotely related to any legitimate government purpose, ac-

tivity or exercise.    Nor was it ever about any sort of public duty or responsibilities - or enforcing the law, or the rule of law, or doing the right thing or anything of the sort.

(60) From the start, all of this was always only about one thing - namely, the Defendants' purely personal and private agenda with regard to me.       More to the point, it was always only about accomplishing exactly what they *did* accomplish in this case - namely, the disastrous and life-changing consequences suffered by Barbara and me as the direct result of their actions.    The Defendants *still* hold our home hostage - by the threat of arrest and criminal prosecution if we ever return to it.    This was, I suggest, most assuredly one of the essential results that they wanted to accomplish.       This is utterly impossible to rationally justify - by any possible legal or logical yardstick.   It is unmistakably nothing but pure meanness, malice, hate, spite, resentment and/or vindictiveness.

(61)   But the question as to whether or not the fact of County ownership, without more, authorized or justified all of the government actions taken on and after September 2, 2015 is, for any purpose related to the instant case, academic and extraneous.

(62)   The question as to the authority of the government actors to act is irrelevant for a very simple reason - to wit, the County never owned my property.    I was, at times material here, the sole lawful owner in fee of my home and property.   I never lost title, nor was I ever in the slightest danger of losing it to the County.

(63) This is all a matter of pure law.   No questions of fact are involved.   All material facts are  uncontroverted or incontrovertible.   Moreover, they all a matter of

record - that is to say, the official record of judicial proceedings on file in the County Clerk's Office.  Certain title documents recorded and maintained in the County Clerk's Office are also material.

(64)   There is here no ambiguity or uncertainty.   There is no wiggle room or play in the joints.  Defendants Buzzetti and Maggs are both licensed attorneys.   They clearly knew and understood very well that Chemung County never had any colorable or possible ownership interest in my home or property.    They knew this because they cooked up the whole deal - their purely personal agenda and gameplan.       The County's naked and brazen assertion of ownership of my property was and is completely untrue, unfounded in both law and fact, false, fraudulent and fabricated out of whole cloth by Defendants Maggs and Buzzetti.    The inconvenient truth and fact that this assertion of County ownership was absolutely bogus and the polar opposite of the truth was obviously far less weighty to these guys than the dispositive simple fact that would always win out - namely, the concocted fiction or ruse of ownership was absolutely indispensable to the success of their personal agenda.   No ownership, no cigar.   No nuthin'.     From then on, the County of Chemung would be the owner of this property.    That was their story and they were stickin' to it.

(65)   From the very start and at all times thereafter, there was essentially just one thing that was of burning importance to both of these guys.   There was one main thing that they wanted and that they intended to accomplish.    They sought to accomplish exactly what they *did*, ultimately, accomplish.   Indeed, they were wildly success-

Page 17

ful.    Their burning ambition and fondest hope was always to visit some world-class

hurt on me - something monumental, notorious, eye-popping, unforgetable and very pub-

lic.  By any measure, that is just what happened to Barbara and me - catastrophic uphea-

val, protracted nightmare ordeal, a parade of horribles and profound suffering and loss.

(66) Read my account of the events.    None of this was accidental or happen-

stance.    The objective facts and evidence leave no doubt that the Defendants Maggs

and Buzzetti jointly planned and orchestrated the entire scenario.       So too, it is clear

beyond all peradventure that every single action and decision personally taken, directed

or caused by these two Defendants were always the ones that foreseeably and inevitably

occasioned the greatest possible hurt, harm and hardship for us.    These guys never lost

even a single opportunity to take the action that they knew would inflict maximum pos-

sible hurt on Barbara and me under the particular circumstances.    This conclusion is

logically compelled by the objective facts and evidence.

(67) The County never owned the property.   I owned it at all times and I own

it now.   Defendants Maggs and Buzzetti have stated again and again that the County's

ownership of this property, without more, authorized and justified all of the governmen-

tal actions taken on and after September 2, 2015.       Since the County did not own the

property, none of these actions were authorized or justified.

(68) Under the Due Process Clause of the Fourteenth Amendment, Barbara

and I had an absolute right to the exclusive possession of my home and to be free of

any disturbance or interference with our lawful, quiet and peaceful use, possession

and enjoyment of our own home and my property.   Neither the County nor any other

government entity had any right or authority to so much as set foot on my property -

without my consent - nor to take any action whatsoever which might in any way dis-

turb or interfere with our enjoyment of our own property.

(69) Neither Barbara nor I have any criminal record.  She is a Registered

Nurse, licensed E.M.T., with two Master's Degrees and successfully completed

two years of medical school in Poland.  All of her licenses are valid and current.

We were wholly innocent of any wrongdoing - nor was there ever any cause or

ground to suspect that we might have been up to any wrongdoing.

(70) If one takes a close and thoughtful look at everything that happened in

this case, it is very clear - and indisputable - that every action taken, directed or caused

by the Defendants was the one that would necessarily, foreseeably and inevitably result

in the greatest possible hurt, harm and/or hardship to Barbara and me.   In other words,

every single time that the Defendants had any opportunity to maximize the injury, pain

or burden for us, that is exactly what they did.    By doing this, Defendants were able to

insure that Barbara and I suffered the most pain, harm, hardship, loss, upset and damage

that could possibly be achieved under the circumstances.   If there is any question about

this, I respectfully submit that all one has to do is look at the record and everything that

is available to study.     I invite the Defendants to cite or point to a single act or decision

they made that contravenes what I say.

(71) One example comes to mind:   if the Defendants had given Barbara and

me any prior notice or warning as to the fact that we would be forcibly removed from our home, we obviously would have been able to plan and prepare for the catastrophic upheaval to come.    The Defendants, of course, wanted to make sure that the disaster would be far more disastrous for us - by making sure that the police busting down our (new) front door that morning would come as a complete surprise to us.    There is no possible logical justification for this.    It is what it is.    An unmistakable, unequivocal revelation of the Defendants' desire to inflict gratuitous hurt, harm and hardship on me and Barbara whenever they had any chance to do this.    I can honestly report that they were extremely successful in this essential aspect of their personal agenda - because the events of the morning of September 2, 2015 and over the days and weeks to come were most assuredly a nightmare for us.    It strikes me as a bit of any irony here that, at the end of the day, the County did not own the property afterall.    I owned it.    No govern- ment actors had any right to set foot on my property.

(72) Upon information and belief, the Defendants Maggs and Buzzetti personal- ly, actively, directly, jointly and in concert concocted, planned, orchestrated and carried out their purely personal agenda and private gameplan which is alluded to in Exhibit A and which was played out in the real world in acts of the government actors on and after September 2, 2015, all of which were herein before spelled out and described.

(73) Upon information and belief, Defendants Maggs and Buzzetti collabora- ted from the start and this mutual understanding and meeting of the minds, shared in- tent, purpose, motives and joint efforts and concerted actions - by them and both of

them personally, directly, actively and continually throughout the period specified in
this pleading.

(74) Upon information and belief Defendants Maggs and Buzzetti also per-
sonally, specifically, actively and persistently directed, ordered, orchestrated, super-
vised and ratified the actions of the Elmira police officers and other government act
ors who personally, physically and actively carried out the actions complained of here,
occurring on and after September 2, 2015.    Defendants Maggs and Buzzetti almost
always appeared in court hearings or proceedings together.    They made no secret of
the fact that they had been working together actively - and were doing so throughout the
period involved here.    Without saying it so many words, they made it clear - to me and
anyone else around - that they were working together to defeat me and make me pay for
my sins, real or imagined.

(75) Defendant Martino played an active, direct, personal and ongoing role
and personally participated in many, if not most, of the planning, orchestration, ex-
execution, supervision, advising, directing and supporting the personal agenda and
gameplan shared consciously and with calculation by all three Defendants.   Defen-
dant Martino was personally present at every court hearing and proceeding.  He was
always around or present when events happened.   He signs, executes and swears to
the accusatory instruments.   He is mentioned by name again and again in court pa-
pers.     When he is on the scene with Elmira police officers, it is he, for the most
part, the one who clearly seems to be directed them and their actions.     His state-

ments to me, or made within my hearing, clearly bespeak an active, personal, direct,

continuous participation in all aspects of the Defendants gameplan and its execution.

(76)   Notwithstanding the fact that I am the owner in fee of my home and

property and I am entitled to immediate and unconditional possession thereof, Bar-

bara and I are, to this day, prevented and prohibited from returning to it or even set-

ting foot in our own yard - as the direct result of the very real, credible, immediate

and continuing threat of arrest and criminal prosecution which is, upon information

and belief, the personal, direct, active and specific direction and order of the three in-

dividual Defendants, and each and all of them, acting jointly and in concert on an on-

going and continuing basis;   Defendant Martino has personally conveyed the threats

to Barbara and me on at least two occasions.

(77)   On at least two occasions, I warned Elmira City officials in writing of

the risks and dangers to my home because of the neighborhood in which it is loca-

ted.   People will get into the house - probably sooner rather than later.   The mere

fact that it is all boarded up will not stop them.   Anything of any value in the house,

most assuredly including every inch of the extensive copper water pipes, will be his-

tory.   Nor would I be surprised if the house is completely trashed.   When I finally

got a response - as I recall it was from a cop - he told me that all of my concerns and

worries were all my problem, certainly no concern of the City of Elmira.

(78)   I suggest that the County of Chemung, the City of Elmira and all three of

the individual Defendants, acting jointly and in concert, personally, actively and direct-

ly, "seized" my home and my property on September 2, 2015 and this "seizure" remain-
ed in full force and effect at all times thereafter, continuing to and including the present
time.        This "seizure" was unreasonable and unlawful under the Fourth Amendment
right to be free of unreasonable government searches and seizures.   From the initial act
on September 2, 2015 and at all times thereafter through the present moment, the Coun-
ty, the City and/or the three Defendants personally, directly and deliberately took, held
and maintained exclusive possession, dominion and control of the property, to the exclu-
sion of its lawful owner, who is entitled to immediate and unconditional restoration of
possession.        In sum, this unreasonable and unlawful "seizure" of my property by the
three individual Defendants, acted jointly and in concert, has been in full force continu-
ously over the entire period from September 2, 2015 through and including the present
time.

(79) I owned my home and this property for thirty (30) years - and have resid-
ed in it as my sole residence continuously throughout this entire period.   The proper-
ty is not incumbered by any mortgage or other incumbrance - which would dilute my
equity in the property.   Twenty or so years ago, the City of Elmira officially assessed
the value of my property for property tax and other purposes at $25,000.00.

(80)   This is a "class of one" equal protection/selective enforcement case.

(81)   The Defendants, all three of the individual Defendants, personally and
acting jointly and in concert each with the other continuously over the entire period
covered by my claims and causes of action, deliberately, continually and persistent-

ly, acted and treated me far differently than they have and do with regard to any other individuals situated similarly to me in all material respects.

(82)   The difference or differential in treatment, as between me, on one hand, and all other individuals similarly situated on the other, is sharp, pronounced and substantial - indeed, more than just merely "substantial."     The difference between lightning and a lightning bug.   Without exception, the Defendants deliberately treat me in a markedly, conspicuously and profoundly more harsh, more punitive, more aggressive, more mean-spirited, arbitrary and clearly pretextual and discriminatory manner, and constantly target me, all too often for nonsense or de minimus things;     on other occasions, they allege code "violations" that would cost me thousands of dollars to remedy or cure according to their orders, demands and directions;   whole new sidewalk, all new soffits all around my house;   major reconstruction of the entire foundation of my house.

(83) Upon information and belief, no other individual(s) situated similarly to me in all material respects have ever or are they treated in a manner that is anything remotely similar or equivalent to the way that I am treated by the Defendants.   I do not believe that any of these individuals situated similarly to me have ever been subjected to the sort of relentless Draconian treatment that the Defendants serve up for me.

(84) To clarify something, the foregoing statements are almost certainly confusing and misleading in at least one respect:   I am confabulating the instant three individual Defendants here with any and all of the Code Enforcement officers, Elmira City officials and Elmira City Attorney's Office legal personnel.   Clearly, the acts

of the instant Defendants must be distinguished from all other City actors with whom
I have dealt over the years.      Nonetheless, all three of the Defendants personally, de-
liberately, actively, and acting jointly and in concert with each other, have treated me
in a vastly different manner than any and all other individuals similarly situated in all
respects have been, were and are treated by the three Defendants.      So, while on its
face, my equal protection claim embraces many actions, many incidents, many govern-
ment actors over a period of quite a few years, for purposes of this case, the important
thing is that all three Defendants have personally and deliberately treated me far differ-
ently consistently over the entire period embraced by this case - that is, sharply and sub-
stantially different from the way that all other individuals situated similarly to me have
been and are treated.

(85)   There is no rational explanation or justification in law or logic for this
sharp and substantial difference in treatment;  it is rather personal, arbitrary, caprici-
ous, discriminatory, impermissibly motivated, unlawful, unconstitutional and based
on nothing more than the whim of the government actor.      This is particularly true
of so much of the real-world situation as personally and directly involves the three
Defendants in this case.   Their actions in this regard are clearly far more egregious,
driven by purely personal animus and much more malevolent and evil-minded - with
far more serious and damaging consequences for me.

(86)   I want to expand on the equal protection/selective enforcement claim
a bit - because, in my view, this is the underpinning and essential thread that ties to-

gether not only the case sub judice and the two earlier cases  filed in this Court rela-

ting to the overall situation here, but also a clear and unmistakable continuum or pat-

tern of actions, events and consequences that go back maybe ten years before that.   I

will explain things in what might look like a fairy tale, but it is, I suggest, objectively-

verifiable fact, truth and reality.

(87) I might note, parenthetically, that my background is in physics - theoret-

ical, as opposed to experimental, physics.    At my school, it was the standing joke

that, in the theoretical camp, the lunatics had escaped and were running the asylum.

The principal promulgator of this notion was Professor Hans Betha, Director of The-

oretical Physics for the Manhattan Project.

(88)   I was drawn to my field instinctively because I am crazy, think wild

and entertain fanciful imaginings.      Nonetheless, my field is science, not science

fiction.  I am congenitally unable to allow myself or my theories to run afoul or de-

part from the data and empirical evidence that comes forward - and instantly inval-

idates even the most long-held, most cherished theories.

(89) So it is here.   I drone on and on with what might really look like flights

fancy - reading all sorts of things into the underlying facts.   This is dangerous for a

non-lawyer pro se litigant.      I am not sure about this, but it is my guess that judges

and law clerks have a notion that people like me have a marked proclivity for getting

way off track - and doing things based on their own homespun way of doing them, in-

cluding a propensity for telling the story that is important to them and doing so based

on their own notions as to what is material and what is not.

(90) In any event, the point that I wanted to make - and am making so clumsily and inartfully here - is simply that I invite the closest and most unforgiving scrutiny of everything that I say, claim, argue or conclude.    This has always been the best thing for me.

(91)   As all too often happens in small towns - and Elmira really is a small town in so many ways - the business of local government becomes rather personal.    More often than not, this is a good thing for the private citizen - because it translates to favorable treatment by officials who are in a position to decide who will get municipal business or contracts.    How I would love that to be the situation here.    But it is not.    Not even close.    Indeed, the polar opposite.

(92)   When I lived on the Upper East Side of Manhattan, one would never encounter anything like this - except maybe once in a blue moon.    The people are smart and have good lawyers on speed dial.    Moreover, government actors are unable to deviate from the norm too much.    Controls are in place - with supervisors to enforce and apply them.

(93)   The City of Elmira is a galaxy far, far away.    The local government promotes a culture that rests upon the idea of enforcement.    I also lived in Ithaca for years and the culture there is wholly different.    City officials who stood for the idea of putting a yoke on the residents are City officials who will likely be City Officals Emeritus fairly soon.    People do not need to be reined in or motivated by ex-

ternal dictates.     In Elmira, the government has a guiding notion that people have

to be subject to rules as to which there will be mandatory compliance.

(94)   When it comes to code enforcement, this attitude and culture clearly

predominates.   Code Enforcement officers enforce - and compliance is not only not

voluntary, but enforcement is swift, tough and aggressive.     People kneel down and

defer - because these code guys can stitch a person up real bad.   You mess with them

and you find an enormous increase in your real property tax bill.     These code guys

are only too well aware of that.     They are accustomed to dealing with people out of

fear, rather than courtesy or respect or good will.

(95) Another problem is that there are always less than a handful of these

guys - and there is an incestuous relation amongst and between them, in my view

any way.     There are not only no controls or supervisors to enforce them, these guys

operate with the awareness that tough, aggressive, hard-nosed residential code enforce-

ment is what is expected and demanded of them.   As former Mayor Skidmore said in

a television interview, "code enforcement is my ticket."   In the context, her message

was crystal clear.   Mirroring the sentiments and thinking of City Council and the

City Manager,   strict, strong and stringent code enforcement is probably the most

salient and bottom-line policy in the City.   The thinking is presumably that the Ci-

ty  has pretty much gone to seed and City officials want to reverse that.

(96)   With all of the foregoing in mind, I suggest that what happened to me

was probably predictable.   I got under these guys' skin early on - and things got pro-

gressively worse because I am probably the Perfect Storm when it comes to aggrava-
ting people in their shoes.   I made things worse with my attitude and thinking.   I do
not blindly defer and, right away, this spelled trouble for me.   The other thing at work
in this situation is undoubtedly my knack for coming up with stuff.   I dig and dig and
dig and come up with stuff.

(97)   With these guys always on my ass - and I mean always, coming over to
my house all the time, usually taking pictures of who knows what outside - I felt that I
had to do something.   As is my wont, I just started digging.  As is also my wont, I did
not stop digging.

(98)  I morphed into the Prince of Darkness for Code Enforcement - and the
locus of power shifted at least in one sense.    I no longer had to lose sleep at night -
having chronic nightmares about the parade of horribles that would surely be visited
upon me if I resisted the demands and orders handed me by these code guys.

(99)   I distinctly recall one incident that probably says a lot about this whole
deal.    One of the things that these guys came up with at my house was a "violation"
based on the wooden posts supporting the canopy over my backyard patio.   The
post were wooden - and the wood was fine.      Not the least rot or anything else.
The wood looked like new.   The posts were stained -oak or something like that -
with a coat of varnish over that.   These were posts that would be at least runners-
up in a nice post competition.

(100)   Appearances are, of course, often deceiving.   The problem, you see,

is no waterproofing.  This guy had scraped away at one of the posts with his pocket knife - and examined the sample.  This is hard to believe, but with what looked like a jeweler's loop.  Right away, I knew that I was dead.  The victim of modern forensic science and exemplary investigative work.

(101) So, I drive out to Lowes and but the best and most expensive waterproofing stuff they sold.  Go home and apply it liberally to my outlaw posts.  The guy comes back, does another biopsy and gives me the diagnosis.    Wrong stuff - not the right stuff for these posts.    If this is hard to believe,   you're preaching to the choir.

(102) I told the guy to take his little badge and get back into his little car - with all the bells and whistles of a cop car - and go heckle some other poor sod.

(103) That was it for me.   No more Mr. Nice Guy.   The code guys hit back hard - mostly show, I guess.    Letting me know that I was still on their radar.   I did not care - not any more.

(104)   The worm had turned.   I had the power, the magic, the mojo, and had cracked the code.    On one hand, I lived with the license of a higher order of beings - because I was more or less bulletproof as to these guys.   On the other hand, I was increasingly fomenting all sorts of resentment, indignation and outrage.   How dare I resist their official authority and power - and, what's worst, rub their noses in their plight or problem with regard to the matter of me.

(105) Skipping over an enormous pile of stuff that happened prior to 2012,

this brings us to 2012 - and the criminal charges that are the bedrock of the case recently filed.   Those charges, upon information and belief, were supposed to be the coup de grace - the final showdown.   Now,  they knew, I would finally be called to account and attone for my innumerable sins.      From the start, these guys were absolutely convinced that I would not only be convicted on all charges, but also wind up sentenced to sixty days in the County Jail.   They could be confident of the sixty days because the judge was Judge Steven Forrest - and, with him, sixty days might well be the best-case scenario for me.

(106) The problem with me  - or one of many - is that I do not roll over or give up.   I would fight that case if I was forced to so in  one small room with just a tiny light bulb to work by.    I would continue in that depressing setting until the point at which someone would have to come in and take out my dead body. I never lose patience and I never get discouraged.   I am Winston Churchill in early May of 1940 - on a small island surrounded by menacing overwhelming forces.

(107)   Well, first order of business was to get rid of this judge - and get a new one, who would hopefully not be calculating the length of the rope for my drop when I go to the gallows to insure that my neck would snap (and do it on the Bench while I am sitting in the courtroom).

(108) Enter Judge Scott Miller - who has a Masters Degree in Jewish Studies from Oxford.   Please do not ask.   I have no clue.   Judge Miller and I went to the same schools.   I did not care about that.    I cared about the fact

that he was very smart - and struck me as very fair.   On the first day of court,
he remarked that he liked my sweater.       I told him that I got it at Samaritan
Center a local charity.

(109)   At some point, it was becoming increasingly clear where the
case was going - and the City people were visibly unhappy and irritated at it.
They had, of course, hyped my case beyond rational belief in the local media
and press.   The trial of the century for Elmira.   They lost it - badly.

(110) I had been advised - by someone that I know and trust and who is
plugged into anything and everything of any importance in the area - that the Ci-
ty were more or less seething.       More against Judge Miller - the extreme Ithaca
liberal.   I overheard such talk out in the hallway even before the final ruling had
come down.     Nobody liked this judge and everyone thought that he was grossly
unfair - and did not understand what was going on here.

(111) Fast forward to September 2, 2015 - and this case.   I am not that sur-
prised about what happened here.              Nothing was more important than setting
things right - and realligning the planets.   It would be positively unthinkable to just
walk away - leaving the status quo as the status quo.     I was probably sitting at
home laughing - at their expense.   I am that smug and self-satisfied.   So too, the
dismissal of the criminal charges had been painfully public.

(112) So here I now am - living in a one bedroom apartment.    These peo-
ple fixed my wagon - and they fixed it real, real good.      Everyone who is anyone

know has no possible doubt as to who had the last laugh.   A lesson has been taught as to what will happen to my ilk - who don't seem to get the memo.   Their victory will always be a source of pride and self-satisfaction for them.   The fact that it was so brutal and disproportionate makes it all the better - for them.   Also the fact that it was so notorious and public - so noone will ever not know what happened in this case.

(113) End of aside.   I will not presume to torture the reader with my equally long account of my litigation history with Defendant Bryan Maggs.   Suffice to say that, to a considerable extent, it mirrors the foregoing reporting.

(114) One final related point:   One thing that has become ever so clear to me is how easy and how convenient it really is for government officials like the Defendants here, simply because of their government posts, to cloak and disguise even the most egregious, unlawful and conscience-shocking abuses of their official power with the appearance, form and trappings of legitimate governmental business and activity.   And how exasperating and impossibly difficult it can be for an individual in

(115) It is respectfully submitted that the deliberate, unlawful and concerted actions taken, directed and/or caused personally by the three individual Defendants, and each and all of them, jointly or individually, clearly violate the following rights, protections and guarantees that I enjoy,  as a matter of right rather than privilege or favor or indulgence, to wit:

[a]   the right and protection guaranteed to Barbara and I to procedural and substantive due process of law, embodied in the Fourteenth Amendment to the Un-

ited States Constitution;

[b] the right to the equal protection of the law and to be free of unlawful discriminatory or selective enforcement of the law, guaranteed to us under the Fourteenth Amendment; and

[c] the right to be free of unreasonable searches and seizures, guaranteed to us under the Fourth and Fourteenth Amendments

(116)  As the direct, necessary and proximate result of the deliberate, unlawful and unconstitutional actions taken, directed or caused by the three Defendants Maggs, Buzzetti and Martino, and each and all of them, personally and acted jointly and in concert with the others,   Plaintiffs Barbara Camilli and Christopher Murphy have both suffered enormous tangible and intangible injury, damage and loss.

(117)   A detailed, comprehensive and itemized statement, description and account of both tangible and intangible injury and damages will have to await my Amended Complaint, inasmuch as Barbara is apparently not up to discussing the subject of emotional upset and such matters at this time.    I need her input and advice to do this, so I will have to address these things in my Amended Complaint - which I most assuredly intend to file at some point sooner, rather than later.

(118) For now, suffice it to say that Barbara and I both suffered enormous emotional and mental injury, pain and anguish as a result of all of this.  I have sustained considerable tangible and monetary damage and loss - perhaps most notably, my own home.

(119) With regard to the question of municipal liability, I respectfully request permission of the Court to address this in my Amended Complaint. For me, these issues are not as straightforward as they are in other cases I know of. With regard to the City of Elmira especially, there are some very peculiar circumstances involved - almost all of them extremely fact-specific. When it comes to any matters relating to code enforcement - residential code enforcement in particular - the City of Elmira is sui generis. I have a sense that there is something here - and I would like a chance to dig into it.

(120) With regard to Chemung County, there is no official policy that might remotely be said to have caused or significantly contributed to any constitutional injury suffered by Barbara or me. Nonetheless, a significant number of factors that are material in determining these questions line up in favor of making the decisions and acts of Defendant County Attorney Bryan Maggs those of the County itself.

(121) In any event, as mentioned above, I respectfully request permission to deal with the question of municipal liability, as to both the County of Chemung and the City of Elmira, in my Amended Complaint. I further respectfully request that any dismissals going to this question, as to either County or City, be without prejudice, so that I might have an opportunity to work on these matters and perhaps redo my pleadings.

(122) If my own research and homework shows me that there is no basis for municipal liability as to either the County or the City, I will come forward and say

so.

(123)   The unnamed, unidentified Defendants designated only as JOHN DOE

NUMBER ONE through and including JOHN DOE NUMBER FIVE are City of Elmi-

ra Police Officers with whom Barbara and I had dealings or encounters on and after

September 2, 2015 in connection with the matters herein complained of.        At this

times, their actual identities and names are all unknown to me, but I believe that some

or all of these officers might well be liable for their actions in connection with this case,

but, as noted, I am handicapped because I know none of their names or identities at this

time.   This being the case, I name them in this initial pleading only as John Does.   As

soon as I am able to ascertain their actual names and identities, I will designate each of

them by name as Defendants in this case, inasmuch as I verily believe that at least some,

but perhaps all, of them are liable for their actions in connection with this case, pursuant

to § 1983.

(124)   The unnlawful, deliberate actions taken, directed and/or caused by the

three individual Defendants and also by the police officers who, upon information and

belief, acted at the instance or direction of the Defendants, personally, specifically and

directly, violated federal constitutional rights and protections that were and are well-

settled and long-settled based on numerous decisions of the United States Supreme Court

and the United States Court of Appeals for the Second Circuit.

(125)   Any rational government official or officer situated similarly to these

three individual Defendants and the police officers involved in this case would cer-

tainly know and understand that the actions herein complained of were unlawful, un-

constitutional and clearly in excess of their lawful authority and discretionary power.

(126) I hereby declare under pain and penalty of perjury that all of the fore-going is true and correct.

(127)  Pursuant to R.R.Civ.Pr., Rule 38(a) and 38(b), we hereby respectfully demand trial by jury as to all issues so triable as of right.

<u>**REQUEST FOR RELIEF**</u>

The Plaintiffs herein, Christopher M. Murphy and Barbara M. Camilli, re-spectfully request judgment against the Defendants above-named, granting them at least the following relief, to wit:

[a] the sum of One Hundred Thousand ($100,000.00) Dollars in compensatory damages to Plaintiff Christopher M. Murphy;

[b] the sum of Fifty Thousand ($50,000.00) Dollars in compensa-tory damages to Plaintiff Barbara Camilli;

[c] the sum of Two Hundred and Fifty Thousand ($250,000.00) Dol-lars in punitive damages from Defendants Bryan Maggs, Matthew Buzzetti and Jo-seph Martino, jointly and severally, in the respective individual capacities, but not in their respective official capacities, to each of the Plaintiffs Christopher Murphy and Barbara Camilli, for a total award of Five Hundred Thousand ($500,000.00) Dollars in punitive damages against the three individual Defendants in their respective individual capacities only;

[d] reasonable attorney's fees as and when the Plaintiff's become represented by an attorney or attorneys in connection with this action, pursuant to 42 U.S.C. § 1988;

[e] prejudgment interest as required or allowed under Article 50 of the New York Civil Practice Law and Rules, and any under any federal statute, rule, practice, procedure, etc., applicable hereto;

[f] the costs and disbursements of this action, insofar as any remain upon deduction from cost award any sums due and owing to the Clerk of this Court, as a result of the exoneration based on my in forma pauperis leave;   and

[f] such additional and further relief as may be equitable and proper to this Court.

Date: August 29, 2018

Signed and respectfully submitted,

Christopher M. Murphy
Plaintiff, appearing *pro se* at this time
Residence and Post Office Address:
105 Geneva Street, Apartment 237
Bath, New York 14810
Telephone: (607) 664-6717

Barbara M. Camilli
Plaintiff, appearing *pro se* at this time
Residence and Post Office Addresss:
105 Geneva Street, Apartment 237
Bath, New York 14810
Telephone: (607) 664-6717

Page 38

EXHIBIT A



**County of Chemung**
**Department of Law**
203 Lake Street
P.O. Box 588
Elmira, New York 14902-0588

Bryan J. Maggs, County Attorney
Phone: (607) 737-2982
Fax:   (607) 737-0351
(not for service of process)

August 24, 2015

Matthew Buzzetti, Esq.
Law Department, City of Elmira
317 East Church Street
Elmira, NY 14901

Re:    757 Linden Place

Dear Attorney Buzzetti:

As County Attorney for Chemung County, the owner of the referenced premises, I hereby give permission for City of Elmira employees, including members of the Elmira Police Department and the Elmira Fire Department, to enter upon the referenced premises for the purposes of preparing the property for demolition.

If any person is found inside of the premises, the County of Chemung requests that the City of Elmira proceed with criminal charges against any such persons for Trespass, or any other appropriate charge.

Very truly yours,

Bryan J. Maggs
County Attorney

BJM:pas